IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**BARRY GOLDWATER INSTITUTE FOR PUBLIC POLICY RESEARCH CENTER,**
*Plaintiff/Appellant*,

*v.*

**CITY OF PHOENIX, ET AL.,**
*Defendants/Appellees*.

---

No. CV-25-0033-PR
**Filed July 17, 2026**

---

Appeal from the Superior Court in Maricopa County
CV2023-003250
The Honorable Danielle J. Viola, Judge
**REVERSED AND REMANDED**

---

Opinion of the Court of Appeals, Division One
259 Ariz. 182 (App. 2025)
**VACATED**

---

COUNSEL:

Jonathan Riches, Scott Day Freeman, Parker Jackson (argued), Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute, Phoenix, Attorneys for Barry Goldwater Institute for Public Policy Research Center

Stephen B. Coleman, Jon M. Paladini (argued), Pierce Coleman PLLC, Scottsdale, Attorneys for City of Phoenix, et al.

Lauren K. Beall (argued), American Civil Liberties Union Foundation of Arizona, Phoenix, Attorney for Amici Curiae American Civil Liberties Union of Arizona and Poder in Action

Nancy L. Davidson, General Counsel, League of Arizona Cities and Towns, Phoenix; Frank Cassidy, Frank Cassidy, P.C., Tucson, Attorneys for Amicus Curiae League of Arizona Cities and Towns

————————

JUSTICE KING authored the Opinion of the Court, in which CHIEF JUSTICE TIMMER, VICE CHIEF JUSTICE LOPEZ, and JUSTICES BOLICK, BEENE, MONTGOMERY, and BERCH (Ret.) joined.*

————————

JUSTICE KING, Opinion of the Court:

¶1        Under A.R.S. § 39-121, "[p]ublic records and other matters in the custody of any officer shall be open to inspection by any person at all times during office hours."  This Court has recognized, however, that access to public records may be restricted where "the interests of privacy, confidentiality, or the best interest of the state in carrying out its legitimate activities outweigh the general policy of open access."  *Carlson v. Pima County*, 141 Ariz. 487, 491 (1984).  This is known as the *Carlson* balancing test.

¶2        This case arises from a public records request by the Barry Goldwater Institute for Public Policy Research Center ("Goldwater") to the City of Phoenix ("City") for records pertaining to collective bargaining negotiations between the City and the Phoenix Law Enforcement Association ("PLEA").  PLEA is an employee organization, also known as a police union, that represents City police officers below the rank of

————————

* Justice Maria Elena Cruz is recused from this matter.  Pursuant to article 6, section 3 of the Arizona Constitution, Justice Rebecca White Berch (Ret.) of the Arizona Supreme Court was designated to sit in this matter.

sergeant.   The City and PLEA periodically negotiate new terms of employment for these officers, which are embodied in an agreement called a Memorandum of Understanding ("MOU").  Goldwater sought copies of MOU drafts and proposals exchanged between the City and PLEA pertaining to an MOU contemplated to begin the following year.  The City denied these requests, claiming that the "best interests of the state" outweighed the general policy of open access to the requested documents.

¶3      The issue before us is whether, in urging the "best interests of the state" exception to disclosure of public records, a public entity must establish that it is probable (more likely than not) that disclosure would cause "specific, material harm."  *See Mitchell v. Superior Court*, 142 Ariz. 332, 335 (1984).  We conclude that a public entity urging the "best interests of the state" exception is not required to prove a greater-than-fifty-percent chance that disclosure would cause specific, material harm as a discrete element in resisting disclosure.  Nonetheless, the *Carlson* balancing test considers the likelihood of specific, material harm and the causal connection between the disclosure and that harm, which are the public entity's burden to prove.  *See id.*; *Carlson*, 141 Ariz. at 491.

¶4      We also consider whether an appellate court applies the *Carlson* balancing test de novo to independently determine whether the public entity's purported interests in non-disclosure outweigh the presumption in favor of disclosure.  An appellate court defers to the trial court's findings of fact unless clearly erroneous.  The appellate court then conducts a de novo review by independently determining whether the evidence demonstrates that the "best interests of the state" outweigh the presumption in favor of disclosure.

## BACKGROUND

### A.  MOU Between PLEA And The City

¶5      Over the years, the City has periodically engaged in the meet and confer process with PLEA, producing MOUs that govern the terms of employment for officers represented by PLEA.  These MOUs address matters such as wages, benefits, work hours, general employment conditions, and the rights of the City, PLEA, and officers.  *See, e.g.*, *Cheatham v. DiCiccio*, 240 Ariz. 314, 317 ¶ 2 (2016).  The officers' compensation and

benefits are taxpayer-funded.  City personnel who conduct negotiations on behalf of the City also receive taxpayer-funded compensation.

**¶6**        The Phoenix City Code includes a meet and confer procedure designed to guide the bargaining process.  *See* Phx. City Code Ch. 2, Art. XVII, Div. 1 §§ 2-209 to -221.  On or before December 1 of an authorized bargaining year, PLEA submits a proposed MOU to the City Manager and files a copy with the City Clerk as a public record.  *Id.* § 2-218(B).  On or before December 8, PLEA may present its proposed MOU at a City Council meeting.  *Id.* § 2-218(C).  The City Council must provide an opportunity for public comment on the proposal at its next meeting.  *Id.* § 2-218(D).  On or before January 5, the City's representative must submit a written response to the proposed MOU and file a copy with the City Clerk as a public record.  *Id.* § 2-218(E).  Upon agreement being reached on an MOU between the representatives of the parties, it is immediately submitted to the City Council and PLEA.  *Id.* § 2-218(F).  If either PLEA or the City Council does not accept any part of the proposed MOU, the entire MOU is subject to renegotiation.  *Id.*  After the proposed MOU has been approved by PLEA, it must be filed with the City Clerk.  *Id.* § 2-218(G).  The City Council must then provide an opportunity for public comment on the MOU's terms before taking action on it.  *Id.*  The Phoenix City Code also sets forth detailed impasse resolution procedures in the event the parties do not reach an agreement by March 1.  *Id.* § 2-219.

**¶7**        The City and PLEA have had an MOU in place for many years.  As relevant here, an MOU was in effect from July 2021 to July 2023.  Due to the July 2023 expiration, PLEA should have submitted a new proposed MOU to the City by December 1, 2022.  *See id.* § 2–218(B).  PLEA, however, did not submit a proposed MOU by December 1, but instead sent a letter to the City on December 1, stating its intent to negotiate wages and benefits in January 2023.

**¶8**        At the December 7, 2022 City Council meeting, PLEA did not present a proposal for a new MOU.  At the December 14, 2022 City Council meeting, members of the public raised concerns about the lack of a publicly available proposed MOU and questioned how public comment could be made without a proposal having been shared with the public.

4

**¶9**        On January 3, 2023, the City sent a letter to PLEA acknowledging receipt of PLEA's intent to negotiate and stating that its December 1 notice did not comply with Phoenix City Code.  The City reminded PLEA of its obligation to comply with Phoenix City Code going forward and stated that "[t]he City is looking forward to working cooperatively with you during the upcoming negotiation process."

## B.  Goldwater's Public Records Request

**¶10**        On December 19, 2022, Goldwater submitted a public records request to the City seeking:

> 1.        All draft Memoranda of Understanding ("MOUs") between the City of Phoenix ("the City") and the Phoenix Law Enforcement Association ("PLEA") contemplated for the fiscal year(s) beginning July 1, 2023.

> 2.        All proposals for MOUs currently being negotiated—or set to be negotiated per City Code Section 2-218—between the City and PLEA concerning the fiscal year(s) beginning July 1, 2023.

> 3.        Any communications to or from City officials regarding PLEA's failure to submit a draft MOU for the fiscal year(s) beginning July 1, 2023.

**¶11**        On January 5, 2023, the City disclosed its January 3, 2023 letter to PLEA, in response to category three of Goldwater's request.  As to categories one and two, the City told Goldwater:

> [A]ny working drafts of MOUs and any proposals submitted during negotiations are not disclosable until filed with the City Clerk's office. Until filing, these documents are intended as working material to establish a mutually agreed upon product between the bargaining unit and the City: the final MOU that is available after filing with the City Clerk's office.

In response, Goldwater asked the City to clarify which public records exception justified withholding the documents.  The City issued a

"Certificate of No Record" for categories one and two, stating that negotiations were still at an early stage and no draft MOUs existed.

**¶12** Thereafter, Goldwater submitted a renewed request for the same records. The City denied Goldwater's request for draft MOUs and proposals because "[r]eleasing those types of materials could create a chilling effect on the parties' willingness to candidly engage with each other and it would hinder the negotiations process."

**¶13** Goldwater then sent a letter to the City Attorney demanding production of the records and noting that the City had not asserted an exception to the public records law. In response, the City Attorney stated that the City had no documents responsive to category one, but "[o]nce a draft MOU between the City of Phoenix and PLEA is finalized, it will be released to the public for review and comment pursuant to the requirements of the City Code." The City Attorney also explained that the City did not have documents responsive to category two at the time of Goldwater's initial request, but it had since obtained responsive documents. Nonetheless, the City was withholding documents responsive to category two during negotiations because disclosure of proposals exchanged during ongoing negotiations "would create a chilling effect on the parties' willingness to candidly engage with each other and would hinder the negotiations process." The City "believes that the best interests of the City protect it from disclosing any draft proposals discussed at the bargaining table." Finally, the City disclosed one additional document responsive to Goldwater's category three request.

**¶14** After the City and PLEA reached a final agreement, a draft MOU was submitted for public comment at the City Council's April 19, 2023 meeting. According to the parties' stipulation, "[t]he City Council ratified the 2023–2024 MOU on or about May 3, 2023. It became effective on or about July 1, 2023, and will expire on or about June 30, 2024." We refer to this MOU as the "2023–2024 MOU."

## C. The Litigation

**¶15**         In March 2023, Goldwater filed a statutory special action against the City,[1] seeking to compel production of the records it had requested.  The trial court conducted an evidentiary hearing during which it heard arguments from the parties, took testimony from several witnesses, and received exhibits and stipulated facts.

**¶16**         The court denied Goldwater's request for relief and entered judgment in favor of the City.  Quoting *Mitchell*, 142 Ariz. at 335, the court observed that under the *Carlson* balancing test, "[t]he probability of 'specific, material harm' must be shown" by the non-disclosing party. According to the court, the City's witnesses "explained that producing the documents during the negotiation process may result in politicizing labor negotiations, collusive activities among bargaining units, public posturing by negotiators, and hindering the free exchange of ideas or proposals without undue influence of constituents."  The City's witnesses further asserted that disclosure "may result in the politicization of the bargaining process that might affect the City's ability to get the best value for the available tax dollars.  Such a result has the potential to affect the City's interests, including the taxpayers' interests."

**¶17**         The court then made the following determination:

> While significant, the general concerns about transparency, advocacy, and accountability identified by [Goldwater] are different, however, from the particularized interest in preserving the ability to negotiate labor agreements free of political pressure, collusion, and unnecessary delay due to impasse. The City provided testimony from individuals directly involved in the collective bargaining process and with experience in labor negotiations with and for the City of Phoenix. [Goldwater] asserts that the City's witnesses merely speculate about potential harm. Even if true, speculative

---

[1] Goldwater also named City representatives as defendants in their official capacities.  When discussing the litigation, we refer to the City and its representatives collectively as the "City."

concerns may be sufficient to support the public interests exception. *See Arizona Bd. of Regents v. Phoenix Newspapers, Inc.*, 167 Ariz. 254, 256 (1991); *Scottsdale Unified School Dist. No. 48 of Maricopa County v. KPNX Broadcasting Co.*, 191 Ariz. 297 [1998]. Here, the Court finds the testimony presented by the City establishes potential material harm (i.e., potential for undue pressure, impasse, and collusion) that outweighs the presumption in favor of disclosure.

The court concluded that the City had met its burden of showing that the "best interests of the state" supported withholding the requested records.

¶18　　But the court also determined that "[w]ithholding the negotiation proposals indefinitely does not comport with the best interests of the state exception." The court observed that "[t]he City seeks to limit disclosure of the draft negotiation materials only until the next MOU is final." Taking into account the City's evidence about longer term negotiating strategy, the court concluded that draft negotiation materials could be withheld only "until the next MOU is finalized."

¶19　　On appeal, the court of appeals considered whether the "best interests of the state" exception justified withholding the requested records. *Barry Goldwater Inst. for Pub. Pol'y Rsch. Ctr. v. City of Phoenix*, 259 Ariz. 182, 187 ¶ 14 (App. 2025). Goldwater argued that the trial court should have required the City to show a probability of specific, material harm if disclosure occurred, instead of mere potential harm. *Id.* at 187 ¶ 17, 188 ¶ 20 (citing *Mitchell*, 142 Ariz. at 335). The court of appeals found no reversible error, noting that the trial court weighed conflicting evidence, assessed witness credibility, recited the correct legal standard, and referenced both a "probability" and "potential" for material harm. *Id.* at 188–89 ¶¶ 19–23. "[T]he record supports the presumption that the superior court knew the applicable law and applied it here." *Id.* at 189 ¶ 22.

¶20　　Nonetheless, the court determined that remand to the trial court was required for further inquiry into the "best interests of the state" exception pertaining to documents responsive to category two. *Id.* at 189–91 ¶¶ 25–34. Based on the record and arguments of the parties, the changes reflected in the most recent MOU compared to the prior MOU were minimal in substance and number. *Id.* at 189–90 ¶¶ 26–28. "Unchanged

provisions of MOUs, in draft or final form, based on prior MOUs that are publicly available public records, would not appear to be protected from disclosure." *Id.* at 190 ¶ 28. The court observed that "the City does not appear to suggest disclosure of boilerplate portions of the MOU that remain unchanged, either during negotiations or in a proposed final MOU, 'would be detrimental to the best interests of the state.'" *Id.* (quoting *Smith v. Town of Marana*, 254 Ariz. 393, 397 ¶ 12 (App. 2022)).

¶21 Moreover, the documents responsive to category two were apparently never provided to or reviewed by the trial court. *Id.* ¶ 29. The court explained that "the Arizona Supreme Court has highlighted the need for in camera court review in undertaking the *Carlson* balancing test, particularly in cases where the best interests of the state is claimed as an exception to public disclosure." *Id.* ¶ 30 (citing *Mathews v. Pyle*, 75 Ariz. 76, 81 (1952); *Carlson*, 141 Ariz. at 490–91; and *Mitchell*, 142 Ariz. at 334). "The result on remand in this case may yield an outcome that significantly varies from the order challenged in this appeal, given review of the documents by the superior court, the passage of time or other factors." *Id.* at 191 ¶ 34. Nonetheless, "remand is necessary for the City to provide to the superior court, for in camera review, both the unredacted public records and versions of those documents with redactions reflecting what the City claims should not be disclosed based on the best interests of the state exception." *Id.*

¶22 We granted review to clarify (1) a public entity's burden of showing specific, material harm when seeking to restrict access to public records under the "best interests of the state" exception, and (2) an appellate court's role in reviewing a trial court's application of the *Carlson* balancing test. These are recurring issues of statewide importance. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

¶23 "Whether the denial of access to public records is wrongful is an issue of law which we review de novo." *Cox Ariz. Publ'ns, Inc. v. Collins*, 175 Ariz. 11, 14 (1993).

## A.   Arizona's Public Records Law And The *Carlson* Balancing Test

¶24         The purpose of Arizona's public records law "is 'to open agency action to the light of public scrutiny.'" *Scottsdale Unified Sch. Dist.*, 191 Ariz. at 302 ¶ 21 (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  The statutes exist "to allow citizens 'to be informed about what their government is up to.'"  *Id.* at 302–03 ¶ 21 (quoting *U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989)).  Accordingly, when a document qualifies as a public record, Arizona's "public records law creates a strong presumption in favor of disclosure."  *Griffis v. Pinal County*, 215 Ariz. 1, 5 ¶ 12 (2007).  There is no dispute that the records Goldwater seeks in this case are public records.

¶25         The Arizona Legislature has developed a variety of statutory public record disclosure exceptions over the years.  *See, e.g.*, *Scottsdale Unified Sch. Dist.*, 191 Ariz. at 300 ¶ 9 (explaining there are "many statutory exceptions to this public right of inspection"); *see also Ariz. Bd. of Regents*, 167 Ariz. at 260 (Corcoran, J., dissenting) (noting "the Arizona Legislature *has* exercised the same discretion in line drawing under the Public Records Law and, in a number of statutes, has adopted exemptions or exceptions").  The City does not contend that a statutory exception applies to the records Goldwater has requested.  Instead, the City relies on the common law "best interests of the state" exception.  As this Court explained in *Carlson*, "[w]hile access and disclosure is the strong policy of the law, the law also recognizes that an unlimited right of inspection might lead to substantial and irreparable private or public harm."  141 Ariz. at 491.  Therefore, an official may "deny or restrict access where recognition of the interests of privacy, confidentiality, or the best interest of the state in carrying out its legitimate activities outweigh the general policy of open access."[2]  *Id.*

---

[2]  Goldwater takes issue with certain aspects of *Carlson* and contends the common law's "best interests of the state" exception to disclosure has created confusion.  Nonetheless, Goldwater has not asked us to overrule *Carlson*.

### B. *Mitchell*'s Statement Regarding "The Probability That Specific, Material Harm Will Result From Disclosure"

**¶26**        Shortly after *Carlson*, this Court was presented with a case arising from a public records request for a convicted defendant's presentence report. *Mitchell*, 142 Ariz. at 333. In *Mitchell*, the petitioner asserted he had a right of privacy regarding the information in the report pertaining to his personal life. *Id.* at 334. In evaluating the issue, *Mitchell* cited *Carlson* for the proposition that Arizona law favors disclosure "unless strong countervailing considerations exist" and "[w]e have always recognized that an 'unlimited right of inspection might lead to substantial and irreparable public or private harm.'" *Id.* (quoting *Carlson*, 141 Ariz. at 491). *Mitchell* then explained: "The burden of showing the probability that specific, material harm will result from disclosure, thus justifying an exception to the usual rule of full disclosure, is on the party that seeks non-disclosure rather than on the party that seeks access." *Id.* at 335.

**¶27**        Relying on "the probability that specific, material harm will result from disclosure" language in *Mitchell*, Goldwater contends that a public entity seeking to establish the "best interests of the state" exception must prove it is probable (more likely than not) that disclosure would cause specific, material harm. The public entity may not merely show the potential for such harm. *See, e.g.*, *Conard v. Dillingham*, 23 Ariz. 596, 605 (1922) ("[T]he word 'probable' is defined as having more evidence than the contrary, or as having more evidence for than against."); *Probability*, Black's Law Dictionary (12th ed. 2024) ("The quality, state, or condition of being . . . more likely than not to happen or to have happened."). Goldwater claims the record here reveals no "probability" that disclosure of the withheld records would cause "specific, material harm," nor did the trial court find one. Instead, the trial court found the mere possibility of such harm.

**¶28**        To understand the meaning of *Mitchell*, we start with *Carlson*. In *Carlson*, this Court stated that public records are to be available for inspection and copying "subject to the official's discretion to deny or restrict access where recognition of the interests of privacy, confidentiality, or the best interest of the state in carrying out its legitimate activities outweigh the general policy of open access." 141 Ariz. at 491. The term "outweigh" demonstrates that the test involves a weighing of competing interests, rather than the application of a rigid set of elements. Indeed, *Carlson* set

forth a "balancing test" that weighs the presumption in favor of disclosure against any countervailing interests—not an elemental test. *See id.*; *Scottsdale Unified Sch. Dist.*, 191 Ariz. at 302–03 ¶¶ 20–24.

**¶29** In *Mitchell*, this Court addressed a court's role under *Carlson* to "balance the rights of the parties" and, in the very next paragraph, explained that a public entity seeking non-disclosure has the burden to show "the probability that specific, material harm will result from disclosure." 142 Ariz. at 334–35. After considering the public's right of access and the petitioner's privacy interests, *Mitchell* affirmed the order directing disclosure of the petitioner's presentence report. *Id.* at 333–35. *Mitchell*, however, did not establish a mandatory threshold requirement for a non-disclosing party to establish that specific, material harm will probably occur before the trial court could proceed with the *Carlson* balancing test. *See id.*

**¶30** This Court's cases after *Mitchell* also do not require proof, as a mandatory threshold element, that disclosure will probably cause specific, material harm.

**¶31** In *Arizona Board of Regents*, this Court determined that "[r]evealing the names of all prospects, those nominated without their permission, and even those nominated with the prospects' tacit permission, could chill the attraction of the best possible candidates for the position" of President of Arizona State University ("ASU"). 167 Ariz. at 258. This Court noted that in a previous presidential search, "two of six finalists withdrew their names from consideration after their names were leaked to the press and published" and "[i]n some cases the publicity attendant to the search has proven detrimental to the search process." *Id.* at 255, 258. Thus, the countervailing interests of confidentiality, privacy, and best interests of the state were appropriately invoked to withhold the names of the 256 prospects. *Id.* at 258. Notably, this Court did not require the Board of Regents to establish that specific, material harm will probably occur from disclosure of the 256 names. *See id.*

**¶32** In *Cox Arizona Publications*, this Court explained that, "because reports of ongoing police investigations are not generally exempt from our public records law, it was incumbent upon [the non-disclosing party] to specifically demonstrate how production of the documents would

violate rights of privacy or confidentiality, or would be 'detrimental to the best interests of the state.'" 175 Ariz. at 14. The non-disclosing party's arguments "based on generalized claims of broad state interest" and "generalized concerns that disclosure of investigative reports would be detrimental to trials and investigations" were deemed insufficient to support the withholding of the records. *Id.* at 13–14. As relevant here, this Court did not require proof, as a mandatory threshold element, that specific, material harm will probably occur from disclosure of the records. *See id.*

¶33 In *Scottsdale Unified School District*, this Court determined that a school district properly withheld teachers' birth dates from a public records request, affirming a trial court's determination that "the teachers' privacy interests in their birth dates outweighed the public interest in disclosure." 191 Ariz. at 299 ¶ 1, 303 ¶ 25. In making this determination, however, this Court did not require the school district to prove that disclosure of the requested records will probably cause specific, material harm. *See id.* at 301–03 ¶¶ 14–25.

¶34 We note that court of appeals' opinions are consistent with this approach. For example, in *Phoenix Newspapers, Inc. v. Keegan*, the court of appeals evaluated a request for disclosure of questions on a statewide academic test. 201 Ariz. 344, 346 ¶ 1 (App. 2001). The court determined that disclosure of examination questions—other than "anchor" questions that would appear on subsequent test forms—properly balanced the state's interest in promoting fairness of the examination against the public's right of inspection. *Id.* at 347 ¶ 9, 348–51 ¶¶ 17–33. In addressing the "best interests of the state" exception, the court did not require the state to establish that specific, material harm will probably occur from disclosure. *See id.* at 348–51 ¶¶ 17–33.

¶35 Also, in *Hodai v. City of Tucson*, the court of appeals determined that information from an ongoing and sensitive investigation may be withheld when disclosure would jeopardize that investigation: "[T]he harm here is specific—even providing the name or minor details of the investigation would link it to the use of the equipment, revealing a sensitive investigative technique in an ongoing case." 239 Ariz. 34, 42 ¶ 21 (App. 2016). With respect to data that could be linked to details of the ongoing investigation, the court determined that "in this context, release of any details of the open case would result in specific, material harm." *Id.*

¶ 22.  *Hodai*, however, did not include a required elemental showing of probable specific, material harm under the *Carlson* balancing test.  *See id.*

**¶36**        A rigid "probability" requirement would mandate that a public entity demonstrate, as a threshold element in all cases, that specific, material harm will probably occur from disclosure of the requested records. If Arizona law required such a rigid "probability" showing, a public entity might have to release records and suffer actual harm before it could establish the "best interests of the state" exception.  Also, such a rigid "probability" showing would alter *Carlson*'s function as a true balancing test.  For example, there may be instances where a public entity cannot demonstrate that specific, material harm will probably occur from disclosure—but if the harm linked to the disclosure were to occur, it would be catastrophic.  A true balancing test accounts for those situations.

**¶37**        Moreover, there are unique categories of documents with no demonstrated history of disclosure.  These could include, for example, requests for records about newly developed technologies.  Under those circumstances, the public entity would have no historical examples to show that specific, material harm will probably occur from disclosure.  *See, e.g.,* *Hodai*, 239 Ariz. at 39–40 ¶¶ 9–13 (addressing a risk of harm by allowing the public access to information about how a new technology works).

**¶38**        Accordingly, a non-disclosing public entity relying on the "best interests of the state" exception is not required to prove as a threshold element that disclosure will probably result in specific, material harm. Instead, the public entity must show a degree of likelihood of specific, material harm resulting from disclosure of the records.  *Mitchell*, 142 Ariz. at 335; *see also Carlson*, 141 Ariz. at 491 (noting "the law also recognizes that an unlimited right of inspection might lead to substantial and irreparable private or public harm").

**¶39**        Nonetheless, if the "best interests of the state" exception could be satisfied merely by asserting it in a conclusory, self-serving fashion, it would defeat the strong presumption of transparency and public access embodied in our public records statutes.  Thus, the degree of likelihood of specific, material harm resulting from disclosure cannot be de minimis, vague, or purely speculative.  *See, e.g., Cox Ariz. Publ'ns*, 175 Ariz. at 14 (concluding that public official did not overcome the legal presumption

favoring disclosure where he "argued in global generalities of the possible harm that might result from the release of police records" that "are not generally exempt from our public records law"); *Smith*, 254 Ariz. at 399 ¶ 19 (explaining that *Carlson* requires more than mere reliance on generalities, and determining that "in its speculation as to the generalized potential harms that might befall a private citizen whose public actions are disclosed through a public records request, the Town fails to identify any 'specific, material harm' that 'will result from disclosure'" (quoting *Mitchell*, 142 Ariz. at 335)); *Hodai*, 239 Ariz. at 42 ¶ 21 (stating that "vague assertions of possible harm [are] insufficient to overcome [the] legal presumption favoring disclosure" (citing *Cox Ariz. Publ'ns*, 175 Ariz. at 14)).  A public entity resisting disclosure must demonstrate some degree of likelihood of specific, material harm resulting from disclosure, and courts must hold the public entity to this burden.

¶40        *Carlson*'s balancing test encompasses multiple factors that a non-disclosing party must demonstrate—a specific, material harm; the degree of likelihood of that specific, material harm occurring; and a causal connection between the disclosure and that specific, material harm.  *See Carlson*, 141 Ariz. at 490–91; *Mitchell*, 142 Ariz. at 335.  The balancing test assesses the strength of all relevant factors to properly weigh the public interest in open access against the "best interests of the state."  In cases where the harm is more specific and material, the harm is more likely to occur, and the causal connection is stronger, the balancing test will favor non-disclosure of records.  Conversely, where the harm is less specific and material, the harm is less likely to occur, and the causal connection is more attenuated, the balancing test will favor disclosure of records.  If relevant, the court should also consider as part of the *Carlson* balancing test whether a public entity's delayed disclosure is temporary and narrowly limited to the duration of the specific, material harm.

¶41        We must address one additional point.  What does *Carlson*'s "best interests of the state" exception mean in the context of a public records request to a municipality?  The "state" generally refers to the government custodian of records.  *See, e.g.*, *Keegan*, 201 Ariz. at 348–49 ¶ 18 (referring to a public official withholding inspection under *Carlson*'s balancing test).  But the "'best interests of the state' standard is not confined to the narrow interest of either the official who holds the records or the agency he or she serves.  It includes the overall interests of the government and the people."

*Id.*  "The public interest includes consideration of how disclosure would adversely affect the agency's mission" and "other ways in which the public would be affected by disclosure or non-disclosure."  *Id.* at 349 ¶ 18; *see also Ariz. Bd. of Regents*, 167 Ariz. at 258 (considering "the interest of ASU and the people of Arizona in selecting the best possible president" and "not discouraging the 'cream' from applying").  Thus, the broader interests of the government and the people—and how they would be affected by disclosure or non-disclosure—are considered under the *Carlson* balancing test, always with a presumption of disclosure.

**¶42**        When the records of a municipality are at issue, we do not discount the possibility that disclosure or non-disclosure could affect people who reside outside the municipality, in which case that evidence should be considered under the *Carlson* balancing test.  But *Carlson* does not mandate that a local municipality demonstrate in all cases that a specific, material harm would impact the entire State of Arizona or the people of Arizona as a whole.

## C.  Appellate Court Review Under The *Carlson* Balancing Test

**¶43**        We now consider an appellate court's standard of review when reviewing a trial court's decision under the *Carlson* balancing test.  Some confusion appears to have arisen from the court of appeals' statement that it would decline "to reweigh on appeal the evidence considered and weighed by the superior court," followed by its reliance on two cases that do not address the applicable standard of review in the context of a public records request.  *See Barry Goldwater Inst. for Pub. Pol'y Rsch. Ctr.*, 259 Ariz. at 190 ¶ 24 (citing *Hurd v. Hurd*, 223 Ariz. 48, 49 ¶ 1, 52 ¶ 16 (App. 2009) (reviewing order awarding sole custody of children to mother and allowing her to relocate with children), and *In re Estate of Pouser*, 193 Ariz. 574, 579 ¶ 13 (1999) (reviewing the interpretation of a decedent's will)).

**¶44**        A trial court's decision regarding the "best interests of the state" exception under *Carlson* will include both factual findings and a legal conclusion.  An appellate court defers to the trial court's findings of fact unless they are clearly erroneous.  *See Scottsdale Unified Sch. Dist.*, 191 Ariz. at 302 ¶ 20; *Ariz. Bd. of Regents*, 167 Ariz. at 257; *Ariz. Republican Party v. Richer*, 257 Ariz. 237, 242 ¶ 10 (2024).

¶45        An appellate court then conducts a de novo review of the trial court's legal conclusion under the *Carlson* balancing test to independently determine whether the evidence supporting non-disclosure due to the "best interests of the state" outweighs the presumption of disclosure. *See Scottsdale Unified Sch. Dist.*, 191 Ariz. at 302 ¶ 20 ("We are, however, free to draw our own conclusions of law from these facts. . . . Thus, whether plaintiffs wrongfully denied defendants access to public records 'is an issue of law which we review de novo.'" (quoting *Cox Ariz. Publ'ns*, 175 Ariz. at 14)). An appellate court is "not bound by the trial court's conclusions of law and [is] free to draw [its] own conclusions of law from the facts found by the trial court." *Ariz. Bd. of Regents*, 167 Ariz. at 257. To the extent the court of appeals declined to weigh the evidence to determine whether the City satisfied the standard, that was error. As part of its de novo review under the *Carlson* balancing test, an appellate court must independently determine whether the non-disclosing party's evidence supporting "the best interest of the state in carrying out its legitimate activities outweigh[s] the general policy of open access." *Carlson*, 141 Ariz. at 491.

**D.  In Camera Review**

¶46        The court of appeals remanded for in camera review. *Barry Goldwater Inst. for Pub. Pol'y Rsch. Ctr.*, 259 Ariz. at 191 ¶ 34. In its analysis, the court noted that "the record suggests much of each MOU is boilerplate that does not change in the meet and confer process" and "[u]nchanged provisions of MOUs, in draft or final form, based on prior MOUs that are publicly available public records, would not appear to be protected from disclosure." *Id.* at 189 ¶ 26, 190 ¶ 28.

¶47        We begin by addressing the utility of in camera review in cases where a non-disclosing party contends that countervailing interests justify withholding records under *Carlson*. This Court has previously emphasized the value of in camera review in such cases.

¶48        In *Mathews*, a newspaper editor filed a petition for mandamus seeking the right to inspect certain documents in the Governor's Office. 75 Ariz. at 77. This Court ordered that the documents in question "be produced in court for the private examination of the trial judge in order that the court may determine whether such . . . documents are confidential and privileged or whether their disclosure would be detrimental to the best interests of the state." *Id.* at 81. To avoid any doubt about the need for in

camera review, *Mathews* added: "In no other way can such questions be determined." *Id.*

**¶49**        Later, in *Carlson*, this Court noted that "[o]ther alternatives" may be able to both protect competing interests and avoid a complete denial of access. 141 Ariz. at 490–91. The first is in camera inspection. *Id.* at 491 (first citing *Mathews*, 75 Ariz. at 81 (ordering in camera inspection by trial court), and then citing *Little v. Gilkinson*, 130 Ariz. 415, 417 (App. 1981) (explaining that "[t]he confidentiality of police files is adequately protected by the kind of in camera inspection made by the trial court")). The second is the process of redacting specific information that should not be disclosed, but providing access to the remainder of the record. *Id.* at 490–91 ("Particularly where the competing interest is one of confidentiality or privacy, a practical alternative to the complete denial of access would be deleting specific personal identifying information, such as names.").

**¶50**        In *Mitchell*, this Court reiterated that "where the court's discretion has been properly invoked, [we] have asked trial courts to make *in camera* inspections of the relevant documents and balance the rights of the parties." 142 Ariz. at 334.

**¶51**        We conclude that the trial court's in camera review of responsive public records is warranted here to aid in its application of *Carlson*'s balancing test. When reviewing such records in camera, the trial court can consider portions of documents in conjunction with the "best interests of the state" exception, including the issue of unchanged MOU provisions that are already in publicly available documents. We remand to the trial court for the City to provide unredacted and redacted versions of public records responsive to all three categories of Goldwater's request that have not already been disclosed for the trial court's in camera review. This will allow the trial court to determine what portions of responsive records, if any, may be withheld under the "best interests of the state" exception.

## E.  Delayed Disclosure Of Public Records

**¶52**        Finally, this case involves the delayed disclosure of public records created in the course of finalizing the 2023–2024 MOU. The trial court determined that withholding "access to negotiating drafts for a limited period (i.e., until the next MOU is finalized) is consistent with the application of the best interests exception." The final judgment ordered

"that Defendants are not required to produce bargaining proposals from a negotiation cycle until the next memorandum of understanding has been finalized."  The trial court's decision reflects that the asserted harm is tied to ongoing negotiations, a point the City does not dispute.  Indeed, the City's position is that it may withhold draft bargaining proposals during ongoing negotiations.

¶53　　　　The court of appeals observed that the "next MOU . . . appears to be to an MOU that should have been finalized and in place effective July 2024."  *Barry Goldwater Inst. for Pub. Pol'y Rsch. Ctr.*, 259 Ariz. at 186 ¶ 12 n.2.  But the record is not entirely clear on this point, and it does not reflect whether any bargaining proposals have since been made available to Goldwater.  If the "next MOU" has indeed already been finalized, the City must—if it has not done so already—provide Goldwater with the bargaining proposals the trial court ordered be disclosed (and any other documents the City has agreed to disclose) without waiting for the conclusion of litigation.

**CONCLUSION**

¶54　　　　We reverse and remand to the trial court for further proceedings consistent with this Opinion.  This includes the trial court's (1) in camera review of public records responsive to Goldwater's requests (redacted and unredacted); and (2) determination of whether the City has established that the "best interests of the state" outweigh the presumption in favor of disclosure under *Carlson* and the framework set forth in this Opinion.  We vacate the court of appeals' opinion.

¶55　　　　We deny Goldwater's request for attorney fees and costs without prejudice to renewing the request at the conclusion of litigation.